1

2

3

4

5            UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
6                   AT SEATTLE

7
   HOLLY RYDMAN, individually and
8  on behalf of a class of similarly
   situated individuals,
9
                    Plaintiff,                    C18-1578 TSZ
10
          v.                                      ORDER
11
   CHAMPION PETFOODS USA, INC.,
12 et. al.,

13                  Defendants.

14        THIS MATTER comes before the Court on Defendants' motions to exclude

15 Stefan Boedeker, docket no. 105, Gary Pusillo, docket no. 103, and certain opinions by

16 Bruce Silverman, docket no 107. Having reviewed all papers filed in support of, and in

17 opposition to, the motions, the Court enters the following Order.

18 **<u>Background</u>**

19        Defendants Champion Petfoods USA, Inc., and Champion Petfoods LP (together,

20 "Champion") manufacture premium dry dog food, which they sell at prices higher than

21 other brands of premium dry dog food. Docket no. 46 at ¶¶ 20, 47 (SAC). Defendants

22 marketed these dog foods with phrases such as: "Ingredients We Love [From] People We

23

ORDER - 1

Trust"; "Nourish as Nature Intended"; "Delivering Nutrients Naturally"; "Biologically Appropriate™"; and "Fresh Regional Ingredients." *Id.* at ¶ 11. Plaintiff alleges that they viewed these representations on the packaging of Defendants' premium dry dog food and relied on the representations in deciding to initially purchase Defendants' dog food from third-party retailers. *Id.* at ¶¶ 7–10.

Plaintiff thereafter continued, for several years, to buy Defendants' dog food from retailers. *Id.* Plaintiff alleges that Defendants "[t]argeted consumers who were willing to pay the Defendants' premium prices" and used improper marketing practices to make "misleading representations and warranties" about the quality of their dog food. *Id.* at ¶ 2. Plaintiff alleges that Defendants' "dog food contained and/or had a material risk of containing non-conforming ingredients and contaminants, such as: (1) Heavy Metals; (2) non-fresh ingredients; and (3) non-regional ingredients." *Id.* at ¶ 12. Plaintiff alleges that Defendants failed to disclose and intentionally omitted that their dog food could contain these "non-conforming ingredients and contaminants," and that Plaintiffs relied on the packaging's omissions. *Id.* at ¶¶ 13–14.

Based on these allegations, Plaintiff brought claims for violation of the Washington Consumer Protection Act, negligent misrepresentation, fraudulent misrepresentation, fraudulent concealment, breach of express warranty, breach of implied warranty, and unjust enrichment. Id. at ¶¶ 247–327. On Defendants' motion, the Court dismissed the fraudulent concealment and breach of the implied warranty claims. *See* docket no. 62.

1    After the Court ruled on the motion to dismiss, this case was stayed pending a

2    Ninth Circuit decision in a related case, *Reitman v. Champion Petfoods USA, Inc.*,

3    No. CV 18-1736, 2019 WL 7169792 (C.D. Cal. Oct. 30, 2019), *aff'd,* 830 F. App'x 880

4    (9th Cir. 2020). *Reitman* involved one class of individuals, each of whom purchased at

5    least one of 23 dog food diets manufactured in Canada and Kentucky, 10 of which are at

6    issue in this case. In *Reitman*, the district court held, and the Ninth Circuit affirmed, that

7    common issues did not predominate because of the differences in packaging on the dog

8    food bags. The stay of this matter was lifted after *Reitman* issued. Plaintiff then moved to

9    certify ten different classes, docket no. 101, and Defendants moved for summary

10   judgment, docket no. 109.[1]

11   In support of its motion for class certification, and in opposition to Defendants'

12   summary judgment motion, Plaintiff offered expert opinions from (A) Stefan Boedecker,

13   an economist, (B) Gary Pusillo, an animal nutritionist, and (C) Bruce Silverman, a retired

14   advertising executive. Defendants now move to exclude all of Boedeker's and Pusillo's

15   opinions and certain opinions offered by Silverman.

16

17

---

18   [1] This matter is similar to actions brought in other jurisdictions. *See Weaver v. Champion Petfoods USA
     Inc.*, 471 F. Supp. 3d 876 (E.D. Wis. 2020), *aff'd*, 3 F.4th 927 (7th Cir. 2021); *Colangelo v. Champion
19   Petfoods USA Inc.*, No. 6:18-CV-1228, 2022 WL 991518 (N.D.N.Y. March 31, 2022); *Loeb v. Champion
     Petfoods USA Inc.*, 359 F. Supp. 3d 597 (E.D. Wis. 2019); *Renfro v. Champion Petfoods USA Inc.*, 475 F.
20   Supp. 3d 1242 (D. Colo. 2020), *aff'd*, 25 F.4th 1293 (10th Cir. 2022); *Song v. Champion Petfoods USA
     Inc.*, No. 18-CV-3205, 2020 WL 7624861 (D. Minn. Dec. 22, 2020), *aff'd*, 27 F.4th 1339 (8th Cir. 2022);
21   *Slawsby v. Champion Petfoods USA, Inc.*, No. CV 18-10701, 2023 WL 2647065 (D. Mass. Mar. 27,
     2023); *Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2022 WL 980832 (N.D. Ill. Mar. 31,
     2022).

22

23

ORDER - 3

1  **Discussion**

2       Federal Rule of Evidence ("FRE") 702 provides that "[a] witness who is qualified

3  as an expert by knowledge, skill, experience, training, or education may testify in the

4  form of an opinion or otherwise if" (i) "the expert's scientific, technical, or other

5  specialized knowledge will help the trier of fact to understand the evidence or to

6  determine a fact in issue," (ii) "the testimony is based on sufficient facts or data,"

7  (iii) "the testimony is the product of reliable principles and methods," and (iv) "the expert

8  has reliably applied the principles and methods to the facts of the case." Fed. R. Evid.

9  702(a)–(d). The FREs "assign to the trial judge the task of ensuring that an expert's

10  testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*

11  *v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). In determining whether expert

12  testimony is reliable, a court may consider certain factors, such as testing, peer review,

13  error rates, and acceptability in the relevant scientific community. *Id.* at 593–94.

14  Nonetheless, "[c]hallenges that go to the weight of the evidence are within the province

15  of a fact finder, not a trial court judge.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d

16  1036, 1044 (9th Cir. 2014).

17       **A.  Dr. Stefan Boedeker**

18       Champion moves to exclude the opinions of Plaintiff's expert Stefan Boedeker.

19  Docket no. 105. Plaintiff retained Boedeker, an experienced statistician and economist, to

20  identify a framework to compute class-wide damages, outline an economic model to

21  quantify alleged economic losses to the class, conduct an empirical analysis to estimate

22  damages, and conduct a consumer analysis on the alleged misrepresentations and

23

omissions. Ex. 1 to docket no. 106 ("Boedeker Report"). As an initial matter, Champion does not challenge Boedeker's qualifications. Champion challenges only the reliability and relevance of his proffered opinions.

Boedeker conducted five consumer surveys, the results of which form the bases of his opinions: four conjoint surveys and one "Expectation Survey." Boedeker conducted the conjoint surveys on (i) the alleged misrepresentations related to the accused ACANA brand; (ii) the alleged misrepresentations related to the accused ORIJEN brand; (iii) the alleged omissions related to the accused ACANA brand; and (iv) the alleged omissions related to the accused ORIJEN brand. Boedeker Report ¶¶ 130–40. Boedeker employed "choice-based conjoint analysis" to "quantify the value of particular characteristics and features of a product to the consumer . . . to then test if, when you change some of those features of a product, . . . there's a change in the price that consumers would pay for that product." Ex. 9 to docket no. 106 Tr. 27:9-19; *see also Zarinebaf*, 2022 WL 910638, at *2 (analyzing the same expert report by Dr. Boedeker and denying motion to exclude). The conjoint surveys had 2,570 respondents. Boedecker Report ¶ 150. Boedeker concluded from his analysis of these conjoint surveys that consumers ascribe value to the alleged misrepresentations and omissions, and view dog food as less valuable after reading corrective statements; he used demand curves to quantify the amount of harm caused by each alleged misrepresentation and omission. *See* Boedeker Report at ¶¶ 168 & 170-71 & Tbl. 18.

Boedeker's Expectation Survey, with 500 respondents, measured consumer perception regarding the alleged misrepresentations and omissions. Boedeker Report

1   ¶ 172. The purpose of the Expectation Survey was to "measure consumer perception

2   regarding the misrepresentations and omissions at issue; and to assess the extent to which

3   those misrepresentations and omissions have a material impact on consumer purchase

4   interest." *Id.*

5        Champion argues that Boedeker's failure to use a control group for his

6   Expectation Survey renders his methodology unreliable. Def. Mot. at 2 (docket no. 105).

7   Plaintiff does not dispute that Boedeker's Expectation Survey did not employ a control

8   group. Under Ninth Circuit law, "technical inadequacies"—like the lack of a control

9   group—go to the weight of the survey evidence, not admissibility.[2] *Keith v. Volpe*, 858

10  F.2d 467, 480 (9th Cir. 1988); *see also Takeguma v. Freedom of Expression LLC*, No.

11  CV-18-02552, 2021 WL 487884, at *3 (D. Ariz. Feb. 10, 2021); *Mattel, Inc. v. MCA*

12  *Recs., Inc.*, 28 F. Supp. 2d 1120, 1135 (C.D. Cal. 1998) (finding a survey's lack of a

13  control group was a technical unreliability that went to the weight of the survey).

14  Champion is free to examine the potential inadequacies of Boedeker's experimental

15  design on cross examination. But technical inadequacies, by themselves, do not preclude

16  Boedeker's qualification as an expert or the admission of his opinions. *See MacDougall*

17  *v. Am. Honda Motor Co.*, No. 20-56060, 2021 WL 6101256, at *1 (9th Cir. Dec. 21,

18  2021) (reversing the exclusion of Boedeker's conjoint surveys and observing that

19

20

21

22  [2] Defendants' authority for their argument comes from Circuits where lack of a control group may be grounds for excluding expert opinions. *See Colangelo*, 2022 WL 991518, at *10.

23

"technical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.")

Beyond its objections to Boedeker's methodology, Champion also challenges the relevance of the conclusions drawn from his conjoint studies. Champion argues that the conjoint surveys cannot adequately calculate class wide damages, and that Boedeker failed to consider supply side economics when reaching his conclusions. Def. Mot. at 16–19 (docket no. 105).

As to the first issue, Champion argues that conjoint surveys are supposed to measure harm to purchasers, but Boedeker measures only the demand-side effects and ignores supply-side effects. *Id.* Without those supply-side considerations, Champion argues that Boedeker cannot reliably estimate market price because he cannot estimate the difference between a "but-for" market price and real-world prices Plaintiff and the putative class members actually paid. *Id.* at 19.

Boedeker's opinion, however, acknowledges that in a but-for world, "the manufacturer faces a lower demand" and if possible, would "set a different price which maximizes profits," but that holding supply constant is still appropriate. Boedecker Report ¶ 36–37 ("However, setting new profit-maximizing prices and volumes sold would contradict the postulate of the Reference Guide on Estimation of Economic Damages that the But-For-World should only correct the harmful Act."). Boedeker uses "real world" prices in his conjoint survey based on Champion documents and contends that doing so considers the supply side factors that Champion argues should be considered (e.g., the cost of production, the cost of goods sold, and the willingness to

1  sell). *Id.* at ¶ 118–119. Boedeker also checked the reasonableness of his damages

2  estimates by comparing the prices of Champion's products to the prices of non-premium

3  dog food and concluded that "[t]he misrepresentations and omissions analyzed in this

4  study would erase many if not all benefits consumers perceive Defendants' products to

5  have over non-premium products." *Id.* This position is consistent with Plaintiff's

6  damages theory—namely, the harm is the premium that they paid over standard dog

7  food.[3]

8       In opposition, Champion points to *In re General Motors LLC Ignition Switch*

9  *Litigation*, 407 F. Supp. 3d 212 (S.D.N.Y. 2019), a case where Boedeker's opinions were

10 excluded for failure to consider supply-side effects. There, the district court distinguished

11 cases that involved "classic allegations of mislabeling" as opposed to "dangerous

12 defects." *Id.* at 238–39 ("On the whole, the courts in these [classic mislabeling cases]

13 cases found that the conjoint analyses 'adequately account[ed] for supply-side factors'

14 because '(1) the prices used in the surveys underlying the analyses reflect[ed] the actual

15 market prices that prevailed during the class period; and (2) the quantities used (or

16 assumed) in the statistical calculations reflect[ed] the actual quantities of products sold

17 during the class period.'" (internal citations omitted)). In this case, Boedeker has

18 adequately accounted for supply-side factors by using actual market prices.

19 _____

20 [3] Champion also argues that Boedeker used dog food packaging not at issue in his conjoint surveys and
   his Expectation Survey, rendering them irrelevant. But the packaging that Boedeker used in his surveys
   and the packaging in the dog food at issue in this case are functionally identical. *See* Boedecker Report ¶
21 168 & Tbls. 16–17. Regardless, Boedecker's surveys also tested *omissions*, which, by their nature, do not
   include a statement. Boedecker Report ¶¶ 99 & 120–21, Tbl. 7, & Figs. 8–9. Thus, Champion's objection
22 as to relevance is meritless.

23

ORDER - 8

Finally, Champion objects to Boedeker's use of the results from the four conjoint surveys to calculate "economic losses for individual misrepresentations, groups of misrepresentations, individual omissions, and groups of omissions." Boedecker Report ¶ 184. Champion argues that these surveys cannot be used to reliably estimate class-wide damages. Champion contends that the damages model does not fit with Plaintiff's claims because it would be "inappropriate statistically speaking" to mix and match results from each of the four conjoint surveys. Def. Mot. at 16 (docket no. 105) (quoting Boedecker Dep. at 93:12–14 (docket no. 106-3)).

Champion misreads Boedeker's report. Boedeker's report does not allow for the results to be viewed in isolation or in combination. Boedeker Report ¶ 184. Boedeker's report also concludes that if Champion is found liable for alleged misrepresentations and omissions, "the economic losses presented in [his] report are similar to the price premium for Orijen/Acana products over non-premium brand products." *Id.* ¶ 187. A price premium theory based on a conjoint analysis is an acceptable method for computing damages. *See Beaty v. Ford Motor Co.,* No. C17-5201 TSZ, 2021 WL 3109661, at *5 (W.D. Wash. July 22, 2021). Champion's motion to exclude Boedeker is DENIED.

### B.  Dr. Gary Pusillo

Champion moves to exclude the opinions of Plaintiff's expert Dr. Gary Pusillo that are reflected in all three of his expert reports. Exs. 1–3 to docket no. 104. Dr. Pusillo offers the opinions that (1) the sources of Heavy Metals in the Dog Food vary and can be controlled by reasonable manufacturing practices ("Heavy Metal Opinions"); (2) Champion's dog food and ingredients are not "certified for safety" ("Safety Opinions");

and (3) certain statements on Champion's packaging are untrue ("Packaging Opinions"). Ex. 1 to docket no. 104. Champion objects to Dr. Pusillo's opinions as exceeding the bounds of his expertise, citing FRE 702. Champion also argues that Dr. Pusillo's opinions are not relevant, are based on unreliable methodology, and would not aid the jury.

Dr. Pusillo has three degrees: a B.S. in animal husbandry, an M.S. in animal production, and a Ph.D. in animal nutrition. Ex. 2 to docket no. 104. He testified that his education included education in heavy metals and that his work and continuing education also includes heavy metals. Ex. 5 to docket no. 104, Tr. 234:17–24. Dr. Pusillo has testified that he serves as a consultant for companies and as part of that work, is involved in "testing protocols, [as well as] SOPs for testing, cleaning, and everything involved with food safety." *Zarinebaf*, 2022 WL 910638, at *9 (excluding Dr. Pusillo as an expert when offering nearly identical opinions). Pusillo is not a veterinarian, veterinary toxicologist, general toxicologist, chemist, microbiologist, or food safety expert. Ex. 5 to docket no. 104, Tr. 130:6–14; Ex. 6 to docket no. 104, Tr. 67:21–23; Ex. 7 to docket no. 104, Tr. 10:13–15.

Although Plaintiff categorizes Dr. Pusillo's Safety Opinions and Heavy Metals Opinions as simply opining on what Champion's dog food contains, he also opines that Champion's dog food is not "tested" or "certified for safety." But Plaintiff has not put safety at issue. Pl.'s Resp. at 6 (docket no. 105). And, although Plaintiff argues that these opinions have nothing to do with safety, that argument strains credulity. Dr. Pusillo's statements concern misrepresentations. A misrepresentation as to safety here would, in

1   fact, require the Court to postulate that Dr. Pusillo's conclusions about safety are true.

2   The Court will not engage in that logical fallacy.[4]

3       Plaintiff makes no claim that Champion represented to consumers that it tests its

4   food for heavy metals or that Champion should have used different manufacturing

5   processes to test for heavy metals. Dr. Pusillo's opinions on these subjects are therefore

6   irrelevant.  In addition, they are not adequately supported by sufficient facts and data, as

7   required by FRE 702(b). For example, Dr. Pusillo has no opinion on what amount of

8   these "contaminants" would be safe, or what amounts would cause an adverse reaction.

9   Ex. 2 to docket no. 104 at 8–9. Without such foundational scientific reasoning, Dr.

10  Pusillo is left with unsubstantiated opinions that are neither reliable nor relevant.

11      Dr. Pusillo's Packaging Opinions are also neither reliable nor relevant. He is not

12  an expert as to what constitutes "raw" or "fresh" in the pet food industry, so he cannot

13  offer a sufficiently reliable opinion as to whether Champion's pet food meets those

14  standards. Ex. 5 to docket no. 104, Tr. 52:13. The opinions he does offer are too

15  conclusory—for example, Dr, Pusillo opines that Champion's food contains ingredients

16  "not in agreement" with the alleged misrepresentations in this case. In addition, several of

17  Dr. Pusillo's "opinions" are merely statements of fact that do not require an expert

18  opinion, e.g., whether Champion uses supplements in their formulations, or food

19

20

---

21  [4] Plaintiff's reliance on *Zeiger v. WellPet, LLC*, 526 F. Supp. 3d 652 (N.D. Cal. 2021), is misplaced. In that case, the safety of the dog food was at issue, and the court in *WellPet* permitted Dr. Pusillo to testify as to the purportedly unsafe levels of arsenic in the dog food. *Id.* at 669–70. Safety was relevant in

22  *WellPet*; it is not relevant here. *WellPet* is therefore distinguishable.

23

1    additives/premixes that are not "100% fresh ingredients." Ex. 5 to docket no. 104,

2    Opinions 12–13. Such opinions would not aid the jury. Defendants' motion to exclude

3    Dr. Pusillo's opinions is GRANTED.[5]

4    ### C. **Bruce Silverman**

5    Champion moves to exclude opinions H–L of Bruce Silverman's expert report.

6    Docket no. 107. Those opinions are:

7         (H)    Consumers who purchase premium-priced dog food are
         concerned about the presence of heavy metals, non-fresh ingredients,
8         and non-regional ingredients in those products.

9         (I)     Consumers would see the presence of heavy metals,
         non-fresh ingredients, and non-regional ingredients as inconsistent
10        with the challenged Champion statements, and material to their
         purchasing decisions.

11
         (J)     It is unreasonable to expect consumers to proactively
12        determine whether the Challenged Statements that appear on the front
         surface of Defendants' packaging are true, or to somehow determine
13        if Defendants had omitted on their packaging the presence of Heavy
         Metals, and non-fresh and non-regional ingredients in their products.

14
         (K)    Had Champion's packaging disclosed that its products
15        contained and/or had a risk of containing heavy metals, a material
         amount of ingredients that were not fresh, and/or a material amount
16        of ingredients that were not local or regional, such disclosures would
         have adversely affected consumers' willingness to purchase the
17        Champion Products.

18        (L)     Assuming Plaintiff's allegations are true, a reasonable
         consumer would be misled and deceived by Champion's packaging as
19        a whole.

20    _____

21    [5] Other courts have done the same. *See, e.g.*, *Zarinebaf*, 2022 WL 910638, at *8–10 (granting motion to
      exclude Dr. Pusillo in full); *Colangelo*, 2022 WL 991518, at *16–18 (granting a motion to exclude
22    Dr. Pusillo's Packaging Opinions and Safety Opinions).

23

1  Ex. 1 to docket no. 108 ("Silverman Report") ¶ 33. Champion argues that these opinions

2  (i) are methodologically unreliable, (ii) do not fit the facts of this case, (iv) are outside of

3  Silverman's relevant experience, and (iv) offer nothing helpful to the jury.

4      Silverman is a former advertising executive with decades of experience, but he

5  does not mention much experience with advertising dog food. Silverman Report ¶¶ 5–25.

6  Champion argues that Silverman's methodology is unreliable because it is "untested and

7  untestable," Def.'s Mot. at 6 (docket no. 107), in part because Silverman did not conduct

8  interviews, surveys, or focus groups. Instead, Silverman relies on his years of experience

9  to opine on what Champion's packaging would convey to a reasonable consumer.

10  Silverman Report at 9–10. Neither *Daubert* nor FRE 702 require surveys or other specific

11  types of external investigation in order to present expert opinions. Indeed, the *Daubert*

12  factors might not apply to testimony that depends on knowledge and experience of the

13  expert rather than a particular methodology. *United States v. Hankey*, 203 F.3d 1160,

14  1169 (9th Cir. 2000) (finding that *Daubert* factors did not apply to a police officer's

15  testimony based on 21 years of experience working undercover with gangs). An expert

16  qualified by experience may testify in the form of opinion if his or her experiential

17  knowledge will help the trier of fact to understand evidence or determine a fact in issue,

18  as long as the testimony is based on sufficient data, the testimony is the product of

19  reliable principles, and the expert has reliably applied the principles to the facts of the

20

21

22

23

1    case. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 579.[6] Defendants are free to explore the

2    issue on cross-examination.

3            On the issue of Silverman's expertise, Silverman's testimony has been challenged,

4    and sometimes limited, in other districts. In *Hadley v. Kellogg Sales Co.*, No. 16-CV-

5    4955, 2019 WL 3804661 (N.D. Cal. Aug. 13, 2019), the district court declined to strike

6    Silverman's testimony where his opinions on consumer behavior were based on years of

7    marketing experience and his review of Kellogg's documents. *Id.* at *24. In *Hobbs v.*

8    *Brother Int'l Corp.*, No. CV 15-1866, 2016 WL 7647674 (C.D. Cal. Aug. 31, 2016),

9    Silverman was permitted to opine "on a reasonable consumer's perceptions of the

10   statements"—relating to whether the defendant's printers were capable of scanning letter-

11   size or legal-size documents—and "on Defendant's [advertising]."; the district court

12   concluded that "the Silverman declaration [is] relevant to assess whether a significant

13   portion of reasonable consumers would be misled by Defendant's [advertising]," and that

14   Silverman's opinions were within his "expertise as an advertising consultant." *Id.* at *4–

15   5. In another case, a Delaware district court rejected an informal survey conducted by

16   Silverman for lacking indicia of reliability, but found that Silverman had supported his

17   advertising opinions with "analysis based on his wealth of experience and with citation to

18   factual support." *See Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co.* LLC, No.

19   _____

20   [6] The Advisory Committee's notes on the 2000 amendments to FRE 702 explain the appropriate course of
     action—FRE 702 (as amended in response to *Daubert*) "is not intended to provide an excuse for an
21   automatic challenge to the testimony of every expert." *See Kumho Tire*, 526 U.S. at 152. "Vigorous cross-
     examination, presentation of contrary evidence, and careful instruction on the burden of proof are the
22   traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595
     (citation omitted).

23

13-cv-324, 2017 WL 3528606 (D. Del. Aug. 16, 2017); *see also Price v. L'Oréal USA, Inc.*, No. 17 Civ. 614, 2020 WL 4937464, at *3 (S.D.N.Y. Aug. 24, 2020) (allowing opinions based on expertise and personal review of product labels, but excluding opinion inferring consumer knowledge of keratin in hair products as not based on Silverman's experience). Finally, in *FLIR Sys., Inc. v. Fluke Corp.*, No. 10-cv-971, 2012 WL 13051121 (D. Or. Nov. 5, 2012), Silverman was barred from testifying as to custom and practice in the thermal camera industry, but was permitted to testify about advertising more generally. *Id.* at *3. The holdings in these cases stand for the unremarkable proposition that expert testimony, when based on experience, will be allowed under *Daubert*, unless the expert steps outside the bounds of his or her experience.

In class actions similar to this matter, district courts have reached different conclusions as to whether Silverman has stepped outside the bounds of his advertising experience. In an in-depth and careful analysis, the *Colangelo* court held that Silverman exceeded his advertising experience when he opined on consumers' impressions about the "Biologically Appropriate" label. 2022 WL 991518 at *15. Similarly, Silverman's advertising experience did not permit him to testify that the "presence of heavy metals . . . alone would indicate . . . that the packaging as a whole is misleading and deceptive," or that any quantity of heavy metals, no matter how small, would be inconsistent with the "Biologically Appropriate" dog food label.  *Id.* Silverman was also not allowed to opine on Defendants' knowledge concerning the use of non-fresh, non-regional ingredients. *Id.* at *16.

1    The *Zarinebaf* court, by contrast, allowed Silverman's testimony in its entirety.

2    2022 WL 910638, at *6. In a broad-brush analysis, the *Zarinebaf* court held that

3    Silverman's advertising experience qualified him to opine on any "take away" that a

4    consumer might glean from Champion's packaging. *Id.* Instead of gatekeeping some of

5    Silverman's opinions, the *Zarinebaf* court suggested that the proper remedy was cross-

6    examination. *Id.*

7         This Court is persuaded by the reasoning in *Colangelo*. Although Silverman may

8    opine on matters related to advertising, he may not opine on matters outside of his

9    expertise. Thus, the Court rules that opinions (H) and (K) are admissible, opinion (I) is

10   admissible except as to heavy metals, and opinions (J) and (L) are inadmissible for the

11   reasons outlined below.

12   **1.   Opinion I: "Consumers would see the presence of heavy metals, non-fresh ingredients, and non-regional ingredients as inconsistent with the challenged**

13   **Champion statements, and material to their purchasing decisions."**

14        In Paragraphs 143–172, Silverman seeks to show that consumers are concerned

15   about heavy metals, that the presence of heavy metals is inconsistent with Defendants'

16   packaging, and that Defendants were aware of this inconsistency. Much of this portion of

17   the report consists of summaries of news articles and Defendants' internal documents,

18   which could be just as effectively interpreted directly by a jury. Although Silverman has

19   provided an adequate basis for concluding that consumers are concerned about heavy

20   metals, he has not similarly provided support for his claims that "pet parents would object

21   to the presence of [any] heavy metals . . ." nor in turn for his claim that the "presence of

22   heavy metals . . . alone would indicate . . . that the packaging as a whole is misleading

23

and deceptive." *Id.* ¶¶ 146–147.[7] To the extent that Silverman articulates his logic for reaching these conclusions, it appears to be that "most consumers care greatly about the healthiness and safety of . . . the foods their pets consume" and "[c]onsumers understand 'Biologically Appropriate™ to mean that Champion is a healthy, natural dog food," but "heavy metals are perceived by consumers to have health risks for dogs." *Id.* ¶¶ 146, 165. Even if all three of these statements are true, it does not follow that "consumers would object to even a minute quantity of heavy metals," nor does it follow that "consumers would consider such a quantity of heavy metals to be inconsistent with the 'Biologically Appropriate' label." *Colangelo*, 2022 WL 991518, at *15. Silverman will not be permitted to provide the opinions outlined in the final sentence of Paragraph 145 and in Paragraphs 146, 147, and 165 of his report.

    **2.**  **Opinion J: "It is unreasonable to expect consumers to proactively determine whether the Challenged Statements that appear on the front surface of Defendants' packaging are true, or to somehow determine if Defendants had omitted on their packaging the presence of Heavy Metals, and non-fresh and non-regional ingredients in their products."**

       Opinion J is excluded as unsupported by any evidence or reasoning. In addition, Paragraph 198 of Silverman's Report is excluded as irrelevant.[8] In Paragraph 202, Silverman asserts that "there is not a practical way for consumers to learn about these omissions." The only support provided for this contention is in the last sentence of

---

[7] These statements also fall under the ambit of Opinion L, discussed *infra*.

[8] Paragraph 198 summarizes a misleading marketing campaign by Dannon in connection with its Activia brand of yogurt, but it makes no reference to consumer reaction to the misleading marketing.

Paragraph 202, which notes that the Defendants' packaging does not "indicate the presence of regrinds or many of the other non-fresh ingredients." The lack of disclosure on the packaging does not itself support the broad proposition that consumers had no way to learn about any omissions. Thus, Paragraph 202 is excluded.

3.  **Opinion L: "Assuming Plaintiff's allegations are true, a reasonable consumer would be misled and deceived by Champion's packaging as a whole."**

Opinion L inappropriately invades the province of the jury. In Paragraphs 186–188 and Paragraph 191 of his report, Silverman seeks to show that "Champion knows that the presence of non-regional ingredients is inconsistent with the challenged statements." *See* Silverman Report ¶ 183. These paragraphs summarize internal documents and other records, which could be analyzed just as effectively by a jury. Silverman has not provided any basis for his opinion, other than speculation, that non-regional ingredients, in some cases from as far away as India, would be seen as a negative by consumers. Thus, in addition to Opinion L, Paragraphs 186–188 and 191 are excluded.

To summarize, the final sentence of Paragraph 145 and Paragraphs 146, 147, 165, 186–188, 191, 198, and 202 are excluded. Silverman's opinion (I) is excluded as to heavy metals and opinions (J) and (L) are excluded in their entirety. Defendants' motion as to Silverman is thus GRANTED in part and DENIED in part. The Court will consider Silverman's admissible opinions in connection with the motions for class certification and summary judgment.

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1)     Defendants' motion as to Boedeker, docket no. 105, is DENIED;

(2)     Defendants' motion as to Dr. Pusillo, docket no. 103, is GRANTED; and

(3)     Defendants' motion as to Silverman, docket no. 107, is GRANTED in part and DENIED in part.

(4)     The Clerk is directed to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 1st day of May, 2023.

Thomas S. Zilly
United States District Judge

ORDER - 19